**UNITED STATES of America,**
**Plaintiff,**

v.

**Leslie Allen BARKLEY, Defendant.**

**No. 04CR119H.**

United States District Court,
N.D. Oklahoma.

Jan. 24, 2005.

Robert Allen Ridenour, Tulsa, OK, for Defendant.

David Edward O'Meilia, Thomas Scott Woodward, Tulsa, OK, for Plaintiff.

## ORDER

HOLMES, Chief Judge.

This matter comes before the Court for sentencing pursuant to a plea of guilty entered by Defendant Leslie Allan Barkley on October 14, 2004 in accordance with Fed.R.Crim.P. 11. The Court now must determine whether, and in what manner, to apply the United States Sentencing Guidelines promulgated under the Sentencing Reform Act of 1984 (the "Act") in light of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621, 2005 WL 50108 (U.S. January 12, 2005).

In *Blakely,* the Supreme Court held that a sentence enhancement imposed by a Washington state court pursuant to judicial factfinding under that state's statutory sentencing guideline scheme violated the defendant's Sixth Amendment rights to a jury and therefore was unconstitutional. In *Booker,* the Supreme Court declared that the principles described in *Blakely* apply with equal force to the United States Sentencing Guidelines (the "Guidelines") and that mandatory enforcement of the Guidelines was therefore unconstitutional since the current federal sentencing scheme did not satisfy the Sixth Amendment requirements described in *Blakely.* To address this concern, the Supreme Court chose to declare the Guidelines advisory, rather than to perform the more exacting task of determining what substantive modifications to the Guidelines would be necessary to satisfy *Blakely.*

For the reasons set forth below, the Court finds as follows: (i) under *Booker,*

the Sixth Amendment rights set forth in *Blakely* apply to the Guidelines; (ii) pursuant to the discretion granted in *Booker*, courts may constitutionally apply the Guidelines if the manner of application fully protects the Sixth Amendment rights articulated in *Blakely*; (iii) law, policy, and common sense dictate that this Court should exercise its discretion by strictly applying in all cases the Guidelines, modified to satisfy *Blakely* in the manner described more fully below; and (iv) in the instant case, the Guidelines should be applied consistent with the principles described in *Blakely* and *Booker*, and as a result sentencing Defendant under the Guidelines here will be constitutional. Based on these findings, the Court hereby imposes the sentence set forth below.

## I

### A. Nature of the Offense

The facts of the instant case are not complicated. On June 21, 2004, Defendant Leslie Allen Barkley entered a Texaco convenience store in Owasso, Oklahoma. He handed the clerk a plastic sack, told him to fill it with money, and left the store. Defendant was immediately pursued by two police officers who had been stationed in the back hallway of the store because of a recent string of robberies at Owasso convenience stores.

As he left the store, Defendant began to jog. A police officer activated the emergency button on his radio and shouted, "Police, don't move!" Defendant began to run. Defendant reached his pickup truck and started the engine. A police officer fired at the tires and deflated both tires on the passenger side of the truck as Defendant was pulling out. Defendant continued driving with several police units in pursuit. Eventually Defendant's way appeared to be blocked. Rather than surrendering, Defendant abandoned his truck and ran to an occupied truck parked across the street. In accordance with Defendant's commands, the passenger left the truck, and Defendant held a gun to the head of the driver in an attempt to persuade her to leave the truck. When Defendant pulled the driver from the truck, one police officer fired at Defendant, hitting him in the left arm. Defendant went down. He was then placed under arrest.

A review of the record reveals that Defendant's behavior on June 21 was not an isolated incident. Witnesses later identified Defendant as being involved in other convenience store robberies in Northeastern Oklahoma during this time period. These robberies took place on June 5, 2004, June 14, 2004, June 16, 2004, and June 19, 2004. Defendant usually brandished a firearm and at least once threatened to shoot a clerk who he claimed was moving too slowly.

### B. Procedural History

Defendant was initially indicted on July 9, 2004 (Docket No. 4) on three counts of Interference with Commerce, a violation of 18 U.S.C. § 1951, for the convenience store robberies on June 16th, 19th, and 21st of 2004; one count of Attempted Carjacking, in violation of 18 U.S.C. § 2119, on June 21, 2004; and four counts of Use of a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c), in connection with the other charged crimes. A Superseding Indictment was filed on October 5, 2004 (Docket No. 23). Count One of that indictment charged Defendant with Interference with Commerce, in violation of 18 U.S.C. § 1951, for the convenience store robbery on June 21, 2004; Count Two of that indictment charged Defendant with Use of a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c), in connection with the convenience store robbery; Count Three of that indictment charged Defendant with Attempted Carjacking, in violation of 18 U.S.C. § 2119;

Count Four of that indictment charged Defendant with Use of a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c), in connection with the attempted carjacking; and Count Five of that indictment charged Defendant with being a Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g).

On October 14, 2004, pursuant to a plea agreement with the United States (the "Plea Agreement"), Defendant agreed to enter a plea of guilty to Counts Two, Three, and Four of the Superseding Indictment under Fed.R.Crim.P. 11. In accordance with the practice of the Northern District of Oklahoma, the change of plea request was accompanied by a Petition to Enter Plea of Guilty (the "Petition"), along with a copy of the Plea Agreement.

Both the Plea Agreement and the Petition stipulate to certain facts relevant to the nature of the offense and sentencing.

The Plea Agreement recites the following facts:

The elements of Attempted Carjacking, 18 U.S.C. § 2119, are as follows:

1. The Defendant, Leslie Allen Barkley, attempted to take a motor vehicle, namely, a 1985 red Chevrolet pick-up truck, Vehicle Identification Number 1GCCC14H0FJ161042, from the person or presence of Dena Gruenwald; and

2. While attempting to take the motor vehicle, the Defendant, Leslie Allen Barkley, intended to cause serious bodily harm to Dena Gruenwald; and

3. The motor vehicle had previously been transported or shipped in interstate commerce; and

4. The Defendant, Leslie Allen Barkley, attempted to take the motor vehicle by the use of force and violence or intimidation.

The elements of Use of a Firearm During a Crime of Violence, 18 U.S.C. § 924(c) are as follows:

5. The Defendant, Leslie Allen Barkley, committed the crimes of violence charged in Counts One and Three; and

6. The Defendant, Leslie Allen Barkley, knowingly used or carried a firearm during and in relation to, or possessed a firearm in furtherance of, that crime of violence; and

7. The crimes of violence alleged in the Superseding Indictment are Attempted Carjacking (elements set forth above) and Interference with Commerce by Robbery, the elements of which are:

a. The Defendant, Leslie Allen Barkley, induced an employee of the business named in Count One to part with property; and

b. The Defendant, Leslie Allen Barkley, did so knowingly and deliberately by robbery or by threatening a person in furtherance of a plan to commit robbery; and

c. In so acting, interstate commerce was obstructed, delayed, or affected.

In regard to the factual basis required by Federal Rule of Criminal Procedure 11(b)(3), the Defendant agrees and stipulates that there is a factual basis for the plea of guilty and relieves the United States of any further obligation to adduce such evidence. Defendant, Leslie Allen Barkley admits knowingly, willfully and intentionally committing or causing to be committed, the acts constituting the crimes alleged in Counts Two, Three and Four in Case No. 04–CR–119–H, and confesses to the Court that Defendant is in fact guilty of such crimes as more fully set forth in the Defendant's Petition to Plead Guilty attached hereto as Exhibit "A".

(Plea Agreement at 6–8).

The Plea Agreement further recites the following facts pertaining to sentencing:

[T]he Defendant admits and stipulates to the following facts for the purpose of sentencing under the United States Sentencing Guidelines:

(1) The Defendant is a Career Offender as to all Counts, pursuant to the United States Sentencing Guidelines § 4B1.1.

(2) The Defendant brandished a firearm during the commission of each of the 18 U.S.C. § 924(c) offenses and the 18 U.S.C. § 2119 attempted carjacking offense pursuant to 18 U.S.C. § 924(c)(1)(a)(ii) and U.S.S.G. § 2B3.1

(Plea Agreement at 5–6).

With respect to sentencing and Defendant's right to a jury under the Sixth Amendment, the Plea Agreement provides:

The Defendant, Leslie Allen Barkley, is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3552 through § 3742, and 28 U.S.C. § 991 through § 998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines § 6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.

If the sentencing court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw Defendant's guilty plea, but will remain bound to fulfill all of Defendant's obligations under this agreement.

(Plea Agreement at 11).

The Plea Agreement further provides:

a. That the Defendant's sentence will be determined under the United States Sentencing Guidelines; and

b. That the Defendant waives any right to have the facts that determine his offense level, including facts that support any specific offense characteristic or other enhancement or adjustment, be alleged in an indictment and found by a jury beyond a reasonable doubt; and;

c. That the Defendant waives all constitutional challenges to the United States Sentencing Guidelines . . . .

(Plea Agreement at 5).

Similarly, the Petition recites the following facts:

On June 21, 2004, in the jurisdiction of the U.S. District Court for the Northern District of Oklahoma, I knowingly brandished and used a firearm in furtherance of a crime of violence, as I was robbing a Texaco convenience store in Owasso, Oklahoma. After robbing the Texaco, I knowingly brandished and used a firearm in furtherance of another violent crime, when I attempted to take the truck of Dena Gruenwald. While attempting to take the vehicle, I intended to cause serious bodily harm to Dena Gruenwald. I agree the vehicle I tried to take had previously been transported or shipped in interstate commerce. I attempted to take the vehicle by the use of force and intimidation.

(Petition at 2–3).

With respect to sentencing and his right to a jury under the Sixth Amendment, the Petition provides:

I know if I plead "Guilty" I am thereby waiving my right to a trial, and there will be no further trial of any kind, either before a Court or jury; and further I realize the Court may impose the same punishment as if I had pleaded "Not Guilty," stood trial, and been convicted by a jury. I specifically understand that by waiving a jury trial I waive any Sixth Amendment right to have the facts that determine my offense level, including facts that support any specific offense characteristic or other enhancement or adjustment, be alleged in an indictment and found by a jury beyond a reasonable doubt. I understand that because I am waiving my Sixth Amendment rights to a jury trial and jury fact-finding, the district court will make all the decisions regarding the facts that support any specific offense characteristic or sentence enhancement.

and that:

I have been advised by counsel I will be sentenced pursuant to the sentencing guidelines procedure established by Title 18 U.S.C. sections 3553 *et seq.* I understand sentencing is a matter left exclusively in the province of the Court; and I understand the sentence imposed by the Court may be within the guideline table range provided by law, or for good cause stated the Court may depart therefrom after a review of all relevant facts and circumstances of my case have been considered by the Court.

(Petition at 4).

At the hearing on October 14, 2004, in accordance with Fed.R.Crim.P. 11, the Court reviewed with Defendant in detail the provisions of the Plea Agreement and the Petition to ensure that he knew, comprehended, and accepted their terms. In addition, the Court received clear and unequivocal representations from Defendant that he understood and agreed that acceptance of his plea by the Court would con-stitute an express waiver of his rights to a jury under the Sixth Amendment. Fed. R.Crim.P. 11(b)(1)(F). Moreover, the Defendant changed his plea after *Blakely,* and therefore, this Court, pursuant to the four-point plan described more fully below, secured a specific waiver that allowed for judicial factfinding at the sentencing phase. In accordance with the policy of the Northern District of Oklahoma, this waiver was memorialized in a written document styled "Waiver of Jury," executed by Defendant, which provided in its entirety as follows:

Comes now the undersigned defendant, and having been fully apprised of my rights, do hereby waive my Sixth Amendment rights to a jury in all respects both as to guilt or innocence and as to sentencing.

Accordingly, I hereby consent that all matters in the above styled and numbered criminal proceedings be determined by the Court in accordance with Rule 23, Federal Rules of Criminal Procedure.

(Waiver of Jury at 1).

## II

In *Booker,* the United States Supreme Court held that the Sixth Amendment rights articulated in *Blakely* apply to the Guidelines. Through the majority opinion in *Blakely* and two separate majority opinions in *Booker,* the Supreme Court has effectively informed the legislative and judicial branches of the United States government that the current guideline system of sentencing may be imposed under one of two circumstances: first, if the existing system is determined to be advisory rather than mandatory, or second, if it is modified to satisfy the Sixth Amendment requirements articulated in *Blakely.* The Supreme Court further held in *Booker* that the former is to be the preferred sentenc-

ing system for the time being, and called upon Congress to decide whether its declaration of judicial discretion merits legislative action. *See Booker*, 125 S.Ct. at 766–68 ("Ours, of course, is not the last word: The ball now lies in Congress' court.").

The Supreme Court based its decision to delete the mandatory requirement of the Guidelines on the supposition that, given the choice, Congress would not have enacted a mandatory system modified to accommodate *Blakely*. *See Booker*, 125 S.Ct. at 758–59 ("Several considerations convince us that, were the Court's constitutional requirement added onto the Sentencing Act as currently written, the requirement would so transform the scheme that Congress created that Congress likely would not have intended the Act as so modified to stand."). Of course, Congress was never presented with this question. More importantly, for purposes of determining the viability of the new, advisory system now legislated by the Supreme Court, Congress was never called upon to choose between such an advisory system and a modified mandatory system. Nevertheless, the Supreme Court amended the federal statute to reflect its belief as to what Congress would have done if presented with these alternatives. This Court believes that Congress will be motivated to reimpose a mandatory sentencing system which, under *Booker*, must reflect such modifications as are necessary to accommodate the Sixth Amendment rights described in *Blakely*. This Court further believes that as a matter of history, policy, and common sense, the best sentencing system is one that both is mandatory and fully accommodates such Sixth Amendment rights.

### A.

The Court finds that the history of the Act dictates that any federal sentencing system should be mandatory. As Senators

Hatch, Kennedy, and Feinstein noted in their *amicus* brief in *Booker*:

> The 1984 Act represents the most comprehensive effort ever undertaken by Congress to reform the federal sentencing system. It is the product of more than a decade of inter-branch and bipartisan legislative efforts in both Houses of Congress ... Since 1984, Congress has continued to monitor this area of law and has made revisions to the sentencing guidelines system through amendments to the 1984 Act and other legislation.

Brief of Amici Curiae, *United States v. Booker* at 2, 4.

Moreover, as Justice Stevens made clear in dissent, "Congress explicitly rejected as a model for reform the various proposals for advisory guidelines that had been introduced in past Congresses." *Booker*, 125 S.Ct. at 783 (Stevens, J., dissenting). The current system is based in large part on the belief that a mandatory system would lead to uniformity, a central goal of the Act. There is simply no reason to believe that Congress will not again seek a mandatory system as the most effective means of achieving uniformity. This Court, therefore, believes that the better course of action is to continue to apply the Guidelines in sentencing, with those changes described below to meet the requirements of *Blakely*. By exercising its discretion so as to apply the Guidelines, modified to satisfy *Blakely*, the Court will be better able to assist the process of developing a workable system in the future, when, not if, Congress undertakes to reimpose the mandatory component of guideline sentencing.

The Supreme Court asserts that an advisory system is in some way more likely to lead to uniformity than a mandatory one:

The ... approach, which we now adopt, would (through severance and excision of two provisions) make the Guidelines advisory while maintaining a strong connection between the sentence imposed and the offender's real conduct—a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve.

*Booker*, 125 S.Ct. at 756–57. This assertion is made despite the obvious fact that what distinguishes a mandatory system from a discretionary system is that the former compels uniformity and the latter does not. "The purpose of the law is to provide certainty. The highest responsibility of a judge is to promote confidence in our legal system." The Hon. Sven Erik Holmes, Introduction, 39 Tulsa L.Rev. 1, 10 (2003). One need only look to the legislative history of the Act and the public debate that accompanied its consideration to appreciate that discrepancies in sentencing had begun to erode confidence in the judiciary. *See Booker*, 125 S.Ct. at 783 (Stevens, J., dissenting) (" 'In seeking "greater fairness," Congress, acting in bipartisan fashion, intended to respond to complaints of unreasonable disparity in sentencing—that is, complaints that differences among sentences reflected *not simply* different offense conduct or different offender history, but the fact that *different judges* imposed the sentences.' ") (internal citation omitted). Thus, Congress had reached the conclusion that mandated uniformity in sentencing was preferable to the disparities arising out of the exercise of judicial discretion, which in turn were the cause of great public concern. Indeed, if this history alone is not sufficient to convince even the greatest skeptic that discretion leads to widely divergent sentencing, one need only review the numerous recent opinions issued by federal judges in the wake of *Blakely* to understand that sentencing will only be uniform if mandated,

rather than left to the personal discretion of each judicial officer.

### B.

The Court further finds that, as a matter of policy, a mandatory sentencing system, modified to satisfy *Blakely*, is better than a discretionary application of the current Guidelines. First, for the reasons discussed above, a mandatory system is more effective in promoting uniformity, which, in turn, is critical to prevent erosion of public confidence in the rule of law. Second, the modifications necessary to satisfy *Blakely*, discussed below, create a better system for protecting defendants' rights. Indeed, the requirement of proof beyond a reasonable doubt for sentencing factors, the application of the rules of evidence and the reduction of the role of relevant conduct in sentencing all contribute to a more just system. These benefits, compelled by *Blakely*, outweigh any problems their administration may create for the sentencing system. But one does not have to agree with the proposition that *Blakely* improves the current system to agree that a mandatory system is preferable to a discretionary system, and that some aspects of *Blakely*, such as the diminishment of the role of relevant conduct, are manifestly positive.

### C.

Finally, the Court finds that a mandatory Guideline system best serves the goal of a fair criminal justice system. The act of sentencing goes to the bedrock of each jurist's most personal views about society, crime and punishment, due process, and fundamental fairness. No federal judge has divine access to wisdom. In this area of the law, the best efforts of each judicial officer do not necessarily produce the fairest result when considered in the context of the criminal justice system writ large. Instead, discretionary sentencing repre-

sents the best presentation of that individual jurist's philosophical and political views of justice under the facts of the case. Thus, in sentencing, the aspiration of a system that is fundamentally fair is thwarted by the very discretion that some would argue is necessary to do justice in an individual case. For example, is the aspiration of a fair system better served by giving a defendant a life sentence instead of a term of years because the judge philosophically believes that it is an appropriate sentence in his case? Or, is the criminal justice system better served by sentencing that defendant less harshly under a uniform system based on established principles, without total resort to the judge's personal values and sense of justice?

Specifically, in the instant case, a sentence of life imprisonment would be the best, and most accurate, reflection of this jurist's own personal view of the appropriate sentence.[1] The most reasonable sentence, however, would be a sentence under the Guidelines, which represents my personal views tempered by considerations of propriety and fairness across the system nationwide. Put simply, I reject the notion that my personal views of justice in an isolated case are preferable to the twenty years of collective wisdom represented by the Guidelines. Justice Steven highlights this concern in his dissent: "As Senator Hatch, a central participant in the [sentencing] reform effort, has explained, 'The discretion that Congress had conferred for so long upon the judiciary ... *was at the heart of sentencing disparity.'*" *Booker,* 125 S.Ct. at 783 (Steven, J., dissenting). Because personal beliefs so dominate decisions in this area, this Court finds that experience and logic compel the conclusion that a mandatory sentencing system will advance the goals of uniformity, fairness, and justice more than a system that is discretionary.

### D.

In sum, the Court believes that the policy goal of general uniformity is vital to maintaining confidence in the rule of law. The Court further believes that it is necessary to have a mandatory guideline system to achieve this goal and that this fact alone will cause Congress to reinstate a mandatory system of sentencing. Accordingly, this Court believes that, until such a mandatory system is imposed, the better part of judgment is to apply the current Guidelines in a manner that fully satisfies the requirements of *Blakely.* This will, in my judgment, create a better sentencing system. Further, when Congress undertakes to develop a new sentencing system in accordance with *Blakely,* there will be a body of judicial experience to inform the development of these policies.[2]

■ Based on the above, the Court finds that it should exercise its discretion by imposing a system of sentencing that faithfully follows the Guidelines in all cases, with only such modifications as the Court finds are necessary to satisfy the requirements of the Sixth Amendment ar-

---

1. In this regard, the Court emphasizes that a discretionary system may result in harsher penalties as often as it results in less severe sentences. Indeed, there is no basis upon which to argue that an advisory system will lead to a more lenient federal criminal justice system.

2. The Court believes the Sentencing Commission has a particularly important respon-

sibility during this interim period to rework aspects of the present Guidelines to be constitutional in the event Congress declares that the federal sentencing system should be mandatory. This work will be furthered immeasurably by courts throughout the country applying the current guidelines consistent with *Blakely,* and learning from the issues that such an application presents.

ticulated in *Blakely*. That system is described below.

## III

The threshold question is whether *Blakely* may be applied to the Guidelines in a manner that is constitutional in light of *Booker*. The Supreme Court stated in *Blakely* as follows: "By reversing the judgment below, we are not, as the State would have it, 'find[ing] determinate sentencing schemes unconstitutional.' (Brief for Respondent 34.) This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment." *Blakely*, 542 U.S. 296, 124 S.Ct. 2531, 2538–39, 159 L.Ed.2d 403, 2004 WL 1402697 at *6. Similarly, in *Booker*, the Supreme Court held that the principles announced in *Blakely* applied with equal force to the federal Guidelines. Clearly, however, the Supreme Court has not yet determined whether the Guidelines, if modified to accommodate *Blakely*, would be unconstitutional. Rather, the Supreme Court has held that any application of the present Guidelines in their entirety can only be done on an advisory basis.

The question becomes, therefore, whether the Guidelines can be applied so as to accommodate the Sixth Amendment rights articulated in *Blakely*, while maintaining the integrity of the federal sentencing system. As described more fully below, the Court finds that the Guidelines can be so applied and, if so applied, are constitutional. The Court further finds that to do so is the proper exercise of its discretion under *Booker*, pending a determination by Congress of whether to reimpose a mandatory federal sentencing system.

On July 8, 2004, this Court announced a four-point plan (the "Plan") to be applied to all criminal cases going forward to maintain the essential viability of the Guidelines while fully protecting the Sixth Amendment rights described in *Blakely*.[3] The Plan, which was described in detail in *United States v. O'Daniel*, 328 F.Supp.2d 1168 (N.D.Okla.2004), provides as follows:

1. The Court will only accept a plea of guilty accompanied by a Sixth Amendment waiver of jury that expressly applies to both guilt or innocence and to sentencing. If a defendant does not desire to waive his or her jury rights in all respects, a jury trial on all relevant issues will ensue in accordance with the Sixth Amendment.

2. For those cases resolved by a plea pursuant to such a comprehensive waiver, judicial factfinding at sentencing will require that any contested enhancement or departure must be based on facts established beyond a reasonable doubt in accordance with the federal rules of evidence. The Court recognizes this may have significant consequences, particularly

---

3. It is noteworthy that the initial confusion occasioned by *Blakely* arose exclusively in the context of "straddle" cases, that is, cases in which a trial was held, or guilty plea entered, prior to *Blakely*, and in which sentencing followed *Blakely*. Both *Booker* and *Fanfan* were such cases. Since the record upon which sentencing is based in those cases was developed prior to *Blakely*, there necessarily were different sentencing outcomes depending on the facts of each case, and on what was established in the record. The focus here is going forward, wherein all facts are estab-lished in full compliance with *Blakely* and *Booker*, from charging documents, to the entry of a plea or holding of a trial, to sentencing. The Court believes that the "straddle" cases will soon pass through the system, and therefore should not form the basis for determining what is best for federal sentencing policy in the long term. The Court further believes that, in the long term, with all parties able to develop a more complete, appropriate, and useful record, it will be possible, and advisable, to implement *Blakely* and *Booker* without risking violation of the Constitution.

in areas such as relevant conduct, determining amounts (e.g. drug quantities and dollar amounts) and role in the offense. Nevertheless, the Court believes the language in *Blakely* equating judicial factfinding with jury factfinding as a matter of Sixth Amendment jurisprudence implicitly, if not explicitly, requires the application of such enhanced evidentiary standards.

3. For those cases that go to trial, facts necessary to support relevant sentencing enhancements and departures will be set forth on the verdict form for the jury to find beyond a reasonable doubt. A mechanism will be established whereby all parties have full notice of such potential enhancements prior to trial. The Court will give the jury such instructions as are necessary and appropriate to make these findings of fact.

4. The United States should include significantly more detail in its charging documents. For those cases that are resolved by entry of a plea, this will reduce the amount of judicial factfinding needed at sentencing. For those cases that go to trial, the jury will have a more complete understanding of the questions that will be presented on the verdict form as matters to be proved beyond a reasonable doubt. The Court anticipates that in some cases that go to trial involving certain sentencing enhancements, particularly relevant conduct, evidence regarding such enhancements may not be admissible because it may be of limited probative value in proving the crime charged and highly prejudicial. Only in special cases, for good cause shown, will the Court utilize a bifurcated procedure whereby guilt or innocence will be considered in a first phase and sentencing evidence will be offered in a second phase. Specifical-

ly with respect to relevant conduct, since the United States hereafter must prove all relevant conduct beyond a reasonable doubt in any event, wherever possible the United States should consider simply including any such relevant conduct allegations as part of the crime or crimes being charged.

The various elements of the Plan, operating together, are intended to maintain the workability and fairness of the Guideline system, while fully protecting each defendant's Sixth Amendment rights under *Blakely* and *Booker*. While mutually interdependent, each element will be subject to appeal and may, as a result, be modified. However, any such modification will not cause the system to fail. For example, the Plan will still function effectively if the Supreme Court ultimately determines that the burden of proof should remain preponderance of the evidence, rather than beyond a reasonable doubt, which is the standard applied here. Furthermore, experience in future cases may suggest that bifurcated proceedings, separating the guilt phase and the sentencing phase, can and should be utilized on a more frequent basis. The purpose here is to set forth a system that is constitutional under *Blakely* and *Booker*, while maintaining the integrity and viability of the Guidelines. In the judgment of this Court, such viability depends in part on a system that is mandatory. The Court will address each element of the Plan in turn.

### A. Waiver of Jury

The Supreme Court announced new Sixth Amendment rights in *Blakely*. The Court, however, did nothing to disturb the current jurisprudence applicable to the waiver of those Sixth Amendment rights. To the contrary, *Blakely* states:

Justice Breyer argues that *Apprendi* works to the detriment of criminal de-

fendants who plead guilty by depriving them of the opportunity to argue sentencing factors to a judge. . . . But nothing prevents a defendant from waiving his *Apprendi* rights. When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding. *See Apprendi,* 530 U.S., at 488, 120 S.Ct. 2348; *Duncan v. Louisiana,* 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). If appropriate waivers are procured, States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty. Even a defendant who stands trial may consent to judicial factfinding as to sentence enhancements, which may well be in his interest if relevant evidence would prejudice him at trial. We do not understand how *Apprendi* can possibly work to the detriment of those who are free, if they think its costs outweigh its benefits, to render it inapplicable.

*Blakely,* 542 U.S. 296, 124 S.Ct. 2531, 2541, 159 L.Ed.2d 403, 2004 WL 1402697 at *8 (internal citation omitted). Moreover, the remedial majority in *Booker* did not address the waiver of jury in any way.

Prior to *Blakely,* the cornerstone of the criminal justice system was waiver of jury, entry of a plea of guilty, and consent to sentencing under the Sentencing Reform Act of 1984, which includes at its heart judicial factfinding. Indeed, 97.1% of all criminal cases in 2002 were resolved without a jury trial at the request of the defendant pursuant to a waiver of his or her Sixth Amendment rights.[4] There is simply nothing in either *Blakely* or *Booker* to suggest that this should change in a post-

*Blakely* environment. Rather, except to the extent that it affects the applicable rules of evidence and burden of proof, *Blakely* predominantly impacts only those cases in which the defendant does not waive his Sixth Amendment rights, and instead proceeds to a trial by jury as guaranteed by the Constitution. In those cases, which constitute a fraction of the total number of criminal cases in the federal system, it is eminently possible to protect the defendant's *Blakely* rights under the Sixth Amendment.

■ A defendant is entitled to a trial by jury as a constitutional right. There is, however, simply no constitutional right to waive a jury trial. *Singer v. United States,* 380 U.S. 24, 36, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) Waiver is a privilege granted by Fed.R.Crim.P. 23, and is expressly conditioned on the consent of the government and approval of the Court. Fed.R.Crim.P. 23(a)(2) and (3); *Singer,* 380 U.S. at 36, 85 S.Ct. 783. Further, there is no authority that grants a defendant a constitutional right to selectively waive his or her Sixth Amendment right to some issues (e.g. guilt or innocence) and not others (e.g.sentencing). Nor is a defendant constitutionally entitled to enter a plea of guilty by waiving his right to a jury, and yet resurrect his right to a jury at sentencing by interposing a constitutional challenge to the Guidelines. A waiver of the Sixth Amendment right to jury is just that, a waiver of jury. A court cannot, and must not, act so as to exert pressure on a defendant to waive his right to a jury. But a court certainly can require that a defendant accept the full and natural consequences of such a waiver, including judicial factfinding at sentencing. If a defendant determines not to accept such consequences, as is his right, the matter

---

4. United States Sentencing Commission, "2002 Sourcebook of Federal Sentencing Sta-

tistics."

should be scheduled for trial in order to fully vindicate the defendant's Sixth Amendment rights.

This Court believes that the continued viability of the Guidelines depends on the continued viability of the current system of waiver and consent. The jurisprudence supporting this system was not challenged in any way by either *Blakely* or *Booker.* Accordingly, waiver and consent should remain the cornerstone of the criminal justice system in the future.

### B.   Burden of Proof and Rules of Evidence

The Guidelines provide that the burden of proof for establishing a sentencing factor is a preponderance of the evidence. U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2002).[5] The commentary to § 6A1.3 states, "The Commission believes that the use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy con-

cerns in resolving disputes regarding application of the guidelines to the facts in the case." *Id.*

The Guidelines further provide that the rules of evidence do not apply to the determination of whether facts support a sentencing enhancement:

> When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

U.S. Sentencing Guidelines Manual § 6A1.3(a) (2002).[6]

---

5.   This parallels Fed.R.Evid. 1101(d)(3), which directs that the rules of evidence do not apply to sentencing.

6.   The Commentary to § 6A1.3 further provides:

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. *See* 18 U.S.C. § 3661; *see also United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 635, 136 L.Ed.2d 554 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); *Witte v. United States,* 515 U.S. 389, 399–401, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); *Nichols v. United States,* 511 U.S. 738, 747–48, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long

as it has sufficient indicia of reliability to support its probable accuracy. *Watts,* 117 S.Ct. at 637; *Nichols,* 511 U.S. at 748, 114 S.Ct. 1921; *United States v. Zuleta–Alvarez,* 922 F.2d 33 (1st Cir.1990) *cert. denied,* 497 U.S. 1038 [110 S.Ct. 3302, 111 L.Ed.2d 811] (9th Cir.1993), *cert. denied,* 510 U.S. 1040, [114 S.Ct. 683, 126 L.Ed.2d 650] (1994); *United States v. Sciarrino,* 884 F.2d 95 (3d Cir.), *cert. denied,* 493 U.S. 997, 110 S.Ct. 553, 107 L.Ed.2d 549 (1989). Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. *United States v. Rogers,* 1 F.3d 341 (5th Cir.1993) *United States v. Fatico,* 579 F.2d 707, 713 (2d Cir.1978) *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Unreliable allegations shall not be considered. *United States v. Ortiz,* 993 F.2d 204 (10th Cir.1993).

U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2002).

This Guideline provision is derived from the federal statute that states:

No limitation shall be placed on the information concerning the background, charac-

The United States asserts that these principles have not been disturbed by either *Blakely* or *Booker*. Indeed, the United States has claimed that if *Blakely* applied in such a way as to change the burden of proof or the applicability of the rules of evidence, this would alter an integral element of the guideline system and, as a result, the entire guideline system would fall. *See* Memorandum by James Comey, Deputy Attorney General, "Department Legal Positions and Policies in Light of *Blakely v. Washington*" (July 2, 2004). For the reasons discussed below, the Court disagrees.

As noted previously, *Blakely* concludes that pursuant to proper waiver and consent a court may engage in judicial factfinding. *Blakely*, 124 S.Ct. at 2541. *Booker* does not in any way disturb this conclusion. This does not suggest, however, that a defendant's Sixth Amendment rights are protected by judicial factfinding under a relaxed burden of proof and without application of the rules of evidence. To the contrary, in *Blakely* the Supreme Court equated judicial factfinding with jury factfinding and stated that the one may be substituted for the other pursuant to proper consent and waiver. *See id.* at 2541. Moreover, the Supreme Court reminded us that *Apprendi* involved the same concern for such a higher standard of proof, stating, "This case requires us to apply the rule we expressed in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 2536.

Logic and common sense dictate that a judge may not constitutionally substitute judicial factfinding for jury factfinding under *Blakely* and *Booker* without a more exacting standard of proof and the application of the rules of evidence. Moreover, there is little remarkable about these adjustments in the context of a criminal case. Under Fed.R.Crim.P. 23, a defendant may waive his or her right to a jury and try the case to the court. There can be no argument that in so doing the defendant would then be subject to a lower burden of proof, or that the rules of evidence should no longer apply. Similarly, under *Blakely* and *Booker*, the Sixth Amendment is the guiding legal principle applicable to factfinding at sentencing, whether by the jury or by the judge, and the Sixth Amendment protections of a higher burden of proof and the application of the rules of evidence should apply no matter which factfinder is selected. Simply stated, there can be no dilution of one's rights under the Sixth Amendment when one factfinder is selected over the other.

The United States has claimed that any change in the burden of proof would disrupt the guideline system so significantly that the Guidelines as a whole would fail as a result. The Court disagrees. The burden of proof is not a significant aspect of the overall interdependency of the various component parts of the Guidelines. As stated above, the cornerstone of the criminal justice system under the Guidelines is the defendant's waiver of jury, entry of a plea of guilty, and consent to sentencing by the judge under the Sentencing Reform Act of 1984. While adjusting the burden of proof and applying the rules of evidence to cases where a defendant enters a plea

---

ter, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18   U.S.C. § 3661 (2000).

and consents to judicial factfinding may require the United States to include more detail in its charging documents or gather more evidence for sentencing, such changes should not precipitate a failure of the system. More importantly, there is simply nothing in the Guidelines, the Act and its legislative history, or the case law to support the Government's claim.

Finally, as a practical matter, every district court judge is aware that in the vast majority of cases, the facts necessary to support sentencing enhancements can be established without regard to the burden of proof. For example, whether the defendant was carrying a gun. In some cases, however, particularly those involving amounts, a defendant's role in the offense, and relevant conduct, the burden of proof will have a significant effect. The Court would only observe that these areas were vexing for purposes of proof prior to *Blakely*, and district court judges developed ways of fairly dealing with these problems.

The Court concludes that a clear purpose of *Blakely* is to ensure that each fact necessary to support a sentencing enhancement must be proved under the rules of evidence beyond a reasonable doubt to a jury or, pursuant to proper waiver and consent, to a judge. This will have its greatest impact in the area of relevant conduct. In this regard, the Court simply comments that, at least to some extent, relevant conduct has long caused discomfort to those involved in the criminal justice system, and *Blakely* directly speaks to that discomfort.[7]

### C. Trial by Jury

In *Blakely* and *Booker*, the Supreme Court held that any fact necessary to support a sentencing enhancement must be determined by a jury. As discussed in Section A above, *Blakely* permits a trial court judge to conduct the necessary factfinding pursuant to a proper waiver and consent. As discussed in Section B above, this grant of authority to the judge must be accompanied by a change in the burden of proof and the application of the rules of evidence to fully equate jury factfinding with judicial factfinding. These steps will effectively resolve over 97% of the cases in the federal criminal justice system.

The remaining cases will present particular problems that require additional time, energy, and effort on the part of all responsible parties in the criminal justice system. But the changes required in the system are not difficult, and district court judges are well experienced in implementing the kind of safeguards that are necessary to protect a defendant's Sixth Amendment rights.

To ensure that *Blakely* and *Booker* are followed, the trial court must put before the jury each fact that must to be established to support a sentencing enhancement. Notably, the trial court is not required to put before the jury each specific sentencing enhancement, but only the *facts* necessary to support any such enhancement. Accordingly, for certain complex enhancements, it may be possible to establish the requisite factual basis without requiring the jury to sift through all the

---

7. The Court notes that there has been much public criticism of cases in which serious criminal conduct has been attributed to relatively passive actors, thus subjecting those individuals to harsh sentencing under the Guidelines (drug "mule" cases, for example). The Court believes that the additional procedural protections described here will address many of the problems presented in such cases, especially considering the impact of those protections on the role of relevant conduct. Moreover, the Court further believes that requiring greater proof of all sentencing facts, especially relevant conduct, will do more to remedy the problems in these cases than will implementing a purely discretionary sentencing system without such procedural protections.

applicable definitions described in the Guidelines.

This Court believes that, in most cases, requiring the jury to find each fact necessary to support a sentencing enhancement beyond a reasonable doubt is neither novel nor onerous. Pursuant to *Apprendi,* 530 U.S. 466, 120 S.Ct. 2348, courts already require juries to determine beyond a reasonable doubt certain issues, such as amounts, that dictate the nature of a statutory offense. *See, e.g.* 21 U.S.C. § 841(b) (1994). Further, in civil cases, district court judges routinely put before juries numerous interrogatories on the verdict form. While posing several questions to the jury in a criminal setting will be more delicate, the civil case experience informs district court judges on the best manner in which to implement this process, and puts district judges on ground that is both solid and familiar.[8]

Of course, in certain cases the issues will compel a procedure that is complicated and time consuming. But because issues in isolated cases are complicated and time consuming does not mean that they cannot be managed in a way that is both effective and fair. There is nothing in this Court's experience with juries that would suggest that a jury cannot make very sophisticated sentencing decisions with proper guidance and instruction by the Court.

### D. Unique Cases

In limited instances, jury factfinding will require specialized procedures. The proper administration of these cases will reside with the district court judges who have vast experience in tailoring the process to ensure fair and efficient outcomes.

The Court anticipates that, in particular, special problems will arise in future cases involving relevant conduct. Instances will occur where evidence of relevant conduct will not be probative of the crime charged and will be highly prejudicial. In such cases, the evidence cannot be admitted during the guilt phase of the trial, thus forcing a second phase for presentation of sentencing evidence to the jury. These cases should be rare. Indeed, since the Government must now establish all facts necessary to support a sentencing enhancement beyond a reasonable doubt, wherever possible the Government should simply charge the relevant conduct under applicable law in the indictment, rather than seek to raise it solely at sentencing.

With respect to those cases in which a bifurcated proceeding is required, the Court notes that district court judges are quite familiar with this process. For example, punitive damage cases routinely require such a procedure. District court judges clearly can adjust without difficulty to the needs presented by such cases.

The Court finds that the Guidelines are constitutional if implemented in accordance with this four-point Plan. The Plan will maintain the workability of the Guidelines, while addressing the concerns expressed in *Blakely* and *Booker* that judicial factfinding by a lower standard of proof can be inconsistent with a defendant's rights under the Sixth Amendment. As noted in *Blakely,* the Supreme Court's goal was not to eradicate sentencing guideline systems, but to ensure that they are implemented in a manner consistent with each defendant's Sixth Amendment rights. *Blakely,* 124 S.Ct. at 2539–40. The Court believes that the Plan achieves this goal.

In *Booker,* the Supreme Court determined that the present Guidelines were unconstitutional if mandatory and determined further to declare that the Guide-

---

8. As in any complicated case, whether civil or criminal, judges can put in place requirements for filing proposed verdict forms and instructions well in advance of trial to ensure the fair and expeditious treatment of these issues.

lines are advisory. This Court intends to exercise its discretion under *Booker* by strictly applying the Guidelines, as modified to satisfy the Sixth Amendment rights articulated in *Blakely*, in all cases. This modified system is designed to maintain the integrity of the Guideline system while ensuring its constitutionality if imposed on a mandatory basis.

## IV

■ In the instant case, Defendant pled guilty to two counts of Use of a Firearm During a Crime of Violence, 18 U.S.C. § 924(c), and one count of Carjacking, 18 U.S.C. § 2119. The count of Carjacking has a statutory maximum of fifteen years in prison.[9] The first count of Use of a Firearm During a Crime of Violence has a statutory minimum of seven years in prison and a maximum sentence of life imprisonment.[10] The second count of Use of a Firearm During a Crime of Violence has a statutory minimum of twenty five years in

prison and a maximum sentence of life imprisonment.[11] In the absence of the United States Sentencing Guidelines (the "Guidelines"), therefore, Defendant could receive a sentence ranging from (at the low end) thirty two years imprisonment to (at the high end) two consecutive life terms plus fifteen years imprisonment.

Under the Guidelines, the base offense level for a violation of 18 U.S.C. § 2119 is normally found in U.S.S.G. § 2B3.1(b)(5). That Guideline provides a base offense level of 20. However, that Guideline also provides that the offense level be increased by two for the instant offense because the offense involved carjacking.[12] Therefore, the total offense level would, absent other considerations, be 22. In this case, however, Defendant meets the Guidelines' standards for career offender status found in U.S.S.G. § 4B1.1.a[13] and has stipulated to such status in the Plea Agreement. Therefore, U.S.S.G. § 4B1.1.b provides that the offense level shall be 29. Howev-

9. The provision reads in relevant part:

Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall -
(1) be fined under this title or imprisoned not more than 15 years or both ....
18 U.S.C. § 2119.

10. The provision reads in relevant part:

Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence ... for which the person may be prosecuted in a court of the United States, uses or carries a firearm or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence ...
(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years ....

18 U.S.C. § 924(c)(1)(A).

11. The provision reads in relevant part:

In the case of second or subsequent conviction under [18 U.S.C. § 9 24(c)], the person shall -
(i) be sentenced to a term of imprisonment of not less than 25 years ....
18 U.S.C. § 924(c)(1)(C).

12. Although that Guideline also calls for the level to be raised by 5 if a firearm was brandished, Application Note 4 of U.S.S.G. § 2K2.4 disallows such an adjustment if the defendant is charged separately for the firearms offense.

13. That Guideline reads:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

er, as Defendant pled guilty to the offense and thereby demonstrated acceptance of responsibility for the offense, the offense level is reduced two levels under U.S.S.G. § 3E1.1.a. Further, in accordance with the Plea Agreement, the United States has filed a motion requesting that Defendant receive an additional one level reduction under U.S.S.G. § 3E1.1.b, and the Court hereby grants that motion. Therefore, the total offense level for the violation of 18 U.S.C. § 2119 (Count Three of the Indictment) is 26.

Under the Guidelines, the term of imprisonment depends not only on the offense level but on Defendant's criminal history. In this case, Defendant's criminal history category is VI, based on the following:

While the record is not entirely clear, Defendant appears to have a significant juvenile history. On February 14, 1978, when Defendant was seventeen, he was arrested for arson; that case was dismissed on December 14, 1978. Defendant, in a pre-sentence report prepared for Arizona, recalled that he was at one point committed to a juvenile detention facility; on another occasion he escaped from a juvenile detention facility.

In March, 1981 Defendant was discharged from the United States Army for drug use; he apparently had traded a .45 caliber pistol to a non-NATO soldier in exchange for heroin.

On October 24, 1982 Defendant robbed an auto parts store in Arizona with a gun. He took $800. Before he left the store he hit the clerk on the back of his head. On January 14, 1984 a jury found Defendant guilty of one count of Armed Robbery, one count of First Degree Burglary, and one count of Aggravated Assault. Defendant was sentenced to twenty eight years in prison on the Armed Robbery, and twenty years apiece, running concurrently, in prison on the other counts.

On October 24, 1982, Defendant robbed a convenience store in Texas with a gun. He took $300 and a case of beer. Before he left the store he hit the clerk twice in the back of his head. On May 12, 1983 he pled guilty to Aggravated Robbery and was sentenced to nineteen years in prison.

In early November 1982, Defendant robbed a female cab driver in Texas with a gun. Defendant took $75; the cab driver also reported that Defendant fondled her. Also in early November 1982, Defendant robbed a Pizza Hut in Texas with a gun. He hit one employee in the head with the gun. He forced all the employees except one into the cooler. Defendant then raped and sodomized the remaining female employee. Defendant took $700.

Defendant was sentenced simultaneously for the robbery of the cab driver and the rape, assault, and robbery at the Pizza Hut. On February 3, 1983 Defendant pled guilty to three counts of Aggravated Robbery for these activities. Defendant was sentenced to twenty one years in prison on each count.

Defendant first served his sentences in the Texas cases. On March 1, 1990 he was paroled to serve his Arizona sentence. He was paroled from his Arizona sentence on June 27, 2003 and transferred his parole via the Interstate Compact to Oklahoma. He was not yet discharged from that parole at the time of the instant offense.

Moreover, Defendant's criminal record continues to mount. On October 10, 2004, while he was in jail for the instant offense, Defendant assaulted a staff member at the David Moss Criminal Justice Center. The Information filed in the state court in that case alleged that Defendant

did commit the crime of Assault and Battery with a Dangerous Weapon, a felony, by unlawfully, feloniously, willfully, wrongfully, and intentionally, without justifiable or excusable cause commit

[sic] an assault and battery on one Douglas Donaldson with a certain dangerous weapon, to-wit: metal drain held in the hand of said defendant the same not being a dangerous weapon per se, but used by said defendant in a manner likely to endanger the life of the said victim and with which he hit the said victim with force and violence, and did thereby inflict wounds on and about the head of the said Douglas Donaldson with the unlawful and felonious intent then and there to do him bodily harm ....

On November 29, 2004 Defendant pled guilty to one count of Assault and Battery with a Dangerous Weapon. Defendant was sentenced to three years in prison on that count. Because that offense has been prosecuted in state court, it plays no role in the sentencing for the instant offense aside from its contribution to Defendant's criminal history.

Under the Guidelines, the combination of an offense level of 26 and a criminal history category of VI makes Defendant eligible for a sentence of imprisonment ranging from 120 to 150 months. Moreover, because Defendant qualifies as a career offender under U.S.S.G. § 4B1.1.a, the Guidelines mandate that the violations of 18 U.S.C. § 924(c) (Counts Two and Four), rather than generating independent sentencing ranges of their own, should be punished by a sentence of imprisonment at the mandatory minimum. In the case of Count Two, the statute requires Defendant serve a term of imprisonment of at least seven years, or 84 months. In the case of Count Four, a second conviction under 18 U.S.C. § 924(c), the statute requires that Defendant serve a term of imprisonment of at least twenty five years, or 300 months.

Under the Guidelines, Defendant would serve a statutorily mandated term of 384 months in addition to a chosen sentence in the Guideline range of 120–150 months established for Count Three. Therefore, Defendant's range under the Guidelines would be from 504 months to 534 months.[14]

V

Based on the above, the Court finds that as a matter of history, policy and common sense, a mandatory sentencing system that accommodates the Sixth Amendment rights described in *Blakely* and *Booker* is preferable to an advisory application of the Guidelines. The Court believes that applying the Guidelines, modified to satisfy *Blakely*, will have the additional benefit of contributing to the public debate when Congress determines whether to reimpose the mandatory component of federal sentencing.

Applying the Guidelines to the instant case, the Court finds that with respect to Count Three, there is a sentencing range of 120 to 150 months. Since there are no aggravating or mitigating circumstances that are not taken into account by the Guidelines, the Court finds that the appropriate sentence for Count Three is 135 months. The Court further finds that with respect to Counts Two and Four, there is a mandatory sentence of 84 months on Count Two and 300 months on Count Four. Accordingly, applying the Guidelines, the Court hereby imposes a sentence of a total of 519 months.

IT IS SO ORDERED.

---

**14.** The Guidelines also prescribe 2–3 years supervised release on Count 3, 3–5 years supervised release on Counts 2 and 4, a fine of $12,500 to $125,000 on Counts 3 and 4, a fine of $250,000 on Count 2, and a special assessment of $300.